## LARSEN ET AL. *v.* LOOTENS ET AL.

(194 Pac. 699; 203 Pac. 621.)

ON MOTION TO DISMISS.

**Appeal and Error—Sureties on Undertaking must Justify Before Judge or Clerk of Court in Which Action is Pending.**

1. Sureties in an undertaking on appeal under Section 550, Subdivision 3, Or. L., if required to justify, must justify before a judge or clerk of the court in which the action is pending.

---

As to whether fraudulent representations by vendor of extent or proportion of land of particular kind included within the tract sold is actionable where purchaser inspects the land, see notes in 16 Ann. Cas. 502; 30 L. R. A. (N. S.) 55.

Appeal and Error—Party Exercising Right of Appeal must Do so
    Subject to Burdens That Law Sees Fit to Impose.

2. The right to appeal is not constitutional, but is a privilege
given by statute, and the party exercising it must do so subject to
such burdens as the law has seen fit to impose.

## ON THE MERITS.

Exchange of Property—Right to Rescission of Exchange not Pre-
    cluded by Plaintiff, Before Trade, Having Visited Premises Re-
    ceived.

3. Plaintiff is not precluded from maintaining suit to rescind an
exchange for a ranch on account of defendant's misrepresentations
as to its soil, the amount under cultivation, and what was raised
on it, because of having visited the place with defendant, when
winter conditions prevailed, preventing a thorough examination, and
defendant falsely pointing out cultivated land as part of the ranch,
and falsely assuring plaintiff of hay and potatoes in the buildings
having been raised on the premises.

Exchange of Property—Demand for Rescission on Learning of Mis-
    representations not Too Late Because Other Misrepresentation
    was Known Earlier.

4. Plaintiff was sufficiently prompt in demanding a rescission of
an exchange for a ranch, he having done so immediately on dis-
covery of the falsity of defendant's representations as to the capa-
city of the land for hay and vegetables, the quality of the soil, and
the contiguity of a school, to develop and disclose which took time,
though he took no action when, two months before, he discovered
that a portion of the seventy-five acres in cultivation, and repre-
sented by defendant to be on the ranch, was on a neighbor's land.

Appeal and Error—Finding Entitled to Great Weight in Case In-
    volving Contradictory Testimony.

5. In case involving contradictory testimony, the opinion of the
trial judge who saw the witnesses, and had opportunity to appraise
the value of their testimony at first hand, is entitled to great weight.

Cancellation of Instruments—Offer Before Suit to Return Property
    not Necessary Where Made in Complaint.

6. It is not an invariable rule that plaintiff must, before bring-
ing suit for rescission of exchange of property, offer to return the
property received by him, if in his complaint he offers to return,
and submits himself in that respect to the equity jurisdiction of the
court.

Exchange of Property—Right to Rescission of Exchange not Lost by
    Sale on Notice of Part of Property to Minimize Damages.

7. Right to rescission of an exchange of property is not lost by
plaintiff, after suit brought, and on notice, selling part of the live-
stock received, to prevent the same from starving and to minimize
damages; defendant being protected by the decree being contingent
on payment of the proceeds with interest, thus putting defendant in
*statu quo* financially.

**Cancellation of Instruments—Complaint Need not Allege Damage.**

8. Complaint for rescission of exchange of property for fraudulent representations need not allege in terms that plaintiff had been damaged by the exchange.

From Multnomah: GEORGE TAZWELL, Judge.

In Banc.

This is a motion to dismiss an appeal for want of a sufficient undertaking.

MOTION OVERRULED.

*Messrs. Davis & Farrell* and *Mr. Wilbur Henderson,* for the motion.

*Mr. Henry S. Westbrook, contra.*

The case was tried in Multnomah County and the appellants served and filed an undertaking signed by sureties who lived in Deschutes County and obtained an *ex parte* order authorizing the justification of the sureties at Bend, Deschutes County, and directing the clerk to transmit the undertaking to the clerk of the Circuit Court of Deschutes County for justification there. The respondents moved the court to set aside said order and require the sureties to justify in Multnomah County, but this was refused.

Subdivision 3 of Section 550, Or. L., provides:

"The qualifications of sureties in the undertaking on appeal shall be the same as in bail on arrest, and, if excepted to, they shall justify in like manner."

Section 268, Or. L., relating to bail on arrest, provides that the sureties upon an undertaking of bail may justify before a "judge of the Circuit Court or County Court or clerk of the court where the action is pending, at a specified time and place." The construction of this clause and its application to cases

of undertaking on appeal are not without difficulties, and possible hardships may result from any construction suggested on the arguments of respective counsel.

Counsel for respondents argue that to hold that a defeated suitor may, after having lost his case, put the successful party to still further trouble and expense by fixing the place for the justification of the sureties in a county remote from where the suit was tried, would work a great injustice and inconvenience by requiring the successful litigant to go to the place designated for the justification in order to cross-examine the sureties as to their qualifications, while the attorney for appellants argues that in the present instance the appellants are comparatively unacquainted in Portland and consequently unable to obtain sureties there, although they are well acquainted at Bend, where they formerly resided, and are consequently able to find friends there to go upon their undertaking. After a careful examination of the statute we are of the opinion that its intent is to require the justification before a judge or clerk of the court in which the action is pending. Such has been the holding in California upon a similar statute: *Roush* v. *Van Hagen,* 18 Cal. 668.

The right to appeal is not constitutional, but is a privilege given by statute, and the party exercising it must do so subject to such burdens as the law has seen fit to impose. As this precise question has not been raised in this court in any case preceding this, we are disposed to adopt a conservative course in order to avoid the hardship which might result from a dismissal of the appeal. The appellants will be permitted to file here a new undertaking properly justified before a judge of the Circuit Court of Mult-

nomah County or the clerk of said court within thirty days after the rendition of this opinion. In default of such undertaking the appeal will be dismissed.                              MOTION OVERRULED.

Affirmed January 17, 1922.

ON THE MERITS.

(203 Pac. 621.)

Department 1.

AFFIRMED.

This is a suit for the rescission of an exchange of properties between plaintiffs and defendants, whereby defendants traded to plaintiffs a ranch situated in the Dry Lake Flat in Crook County, Oregon, together with twenty head of cattle, fourteen horses, some chickens, pigs, farming implements and equipment, and received therefor from plaintiffs a lot and an eight-room house in Beaumont Addition in the City of Portland, Oregon, together with furniture and fixtures.

The complaint alleges several fraudulent representations on the part of defendant Bert Lootens, whereby plaintiffs were induced to make the trade. These may be fully summarized as follows: (1) that the premises were good, level valley land; (2) that eighty acres were under cultivation and seeded to rye; (3) that said eighty acres raised in the year 1918 enough rye, and far in excess thereof, to feed twenty-five head of cattle and five horses; (4) that said land would raise a large quantity of potatoes and other vegetables; (5) that defendants in the year 1918 raised and sacked upon said land four hundred sacks of potatoes; (6) that there was a nine-months' school maintained near said premises, which plaintiffs' two

children could attend; (7) that before closing the trade plaintiff John Larsen visited the premises in company with defendant Bert Lootens, but the land was entirely covered with snow, so that the plaintiff was thereby unable to ascertain the truth or falsity of the representations concerning the character of the soil, made to plaintiffs, but that Lootens showed him large quantities of fine rye straw which he claimed to have raised on the premises and which he represented to be the straw remaining after having fed twenty-five head of cattle and five horses during the winter. The plaintiffs now charge that the straw was not raised on the place but was hauled there from neighboring land. They say also that defendant Bert Lootens exhibited to plaintiff John Larsen one hundred and fifty sacks of first-class potatoes which he claimed were raised on the land, when in fact they had been grown on a tract of land several miles distant. The complaint alleges that all these representations were willfully false and made with the fraudulent intent to induce plaintiffs to make the trade; that, relying upon them, they were induced to make the exchange of properties; that upon learning of the fraud that had been practiced upon them plaintiffs immediately rescinded the trade and requested and demanded of the defendants that they reconvey the real and personal property plaintiffs had given in exchange, and offered to reconvey the property received by plaintiffs; that plaintiffs continued said offer until this suit was instituted and that they now submit a good and sufficient deed to convey said real property to defendants, for delivery to defendants at such time as the court shall direct, and tender to the court all the personal property received by them in the exchange. They say they are ready, able and

willing to deliver all the property received by them, except, however, to avoid the expense of feeding the cattle, plaintiffs sold twenty head of them to one C. M. Gulodson for $1,000, which sum plaintiffs now tender in lieu of said cattle, and they agree to pay such additional amount as the court may find the cattle to have been worth over and above $1,000.

There was a demurrer to the complaint on the following grounds:

"Come now the defendants, by Henry S. Westbrook, their attorney, and demur to the second amended complaint of the plaintiffs filed herein, upon the ground and for the reason that the same does not state facts sufficient to constitute a cause of suit against these defendants or either of them: namely, upon the following points:

"First—No facts are alleged in said second amended complaint, alleging any damages to the plaintiffs; all statements of damages are conclusions of law; actual damages must be alleged in particular; if not, an indispensable element of fraud is lacking.

"Second—It appears from the face of said complaint, that since this action was instituted, without the consent of the defendants, and without authority of the court, plaintiffs have sold the 20 head of cattle mentioned in the complaint, and received $1,000 therefor; and in addition to this act, promise and agree to pay whatever the court finds said cattle to be worth more than said $1,000; this conduct, and these allegations are inconsistent with rescission, and constitute an affirmance of the contract, for which reason, plaintiffs, if they have any cause of action, have an action at law for damages, and not a suit in equity for rescission of contract.

"Third—Plaintiffs' pretended tender to maintain *statu quo* of property is neither good in law nor equity, upon either rescission or for damages, or at all; in that, plaintiffs must not only tender what they received upon said sale, but must tender the full value

of the property sold; and agreement to pay an indefinite sum, to be fixed at a future time, upon litigation, is not a tender sufficient in a suit for rescission for fraud.

"Fourth—That before instituting a suit to rescind a contract, plaintiffs must first offer and tender back a good and sufficient deed, and bill of sale, reconveying both the real and personal property to the defendants; said complaint shows affirmatively this was not done; shows affirmatively no deed or bill of sale was ever offered or tendered to defendants; affirmatively showing by an allegation of a conclusion of law, that said deed is now tendered to court, for delivery as the court may direct; no bill of sale is tendered in any way. The tender of a deed must be unconditional, and before suit.

"Fifth—Courts never presume damages; allegations and proof thereof must be clear and specific; no allegations of damages in any way or manner appear in said complaint."

The demurrer being overruled, the defendants denied the alleged false representations and made the following allegations:

"That before said trade or exchange was consummated and before said property was delivered, the plaintiff John Larsen, for himself and for his said wife, went to the said property in Crook County, Oregon, and examined the same, and in said examination saw the property, examined the soil, ascertained the location thereof; saw that part thereof which had been cultivated, saw and knew that said land was valuable chiefly for a cattle ranch and for grazing and was satisfied therewith; that thereafter, on or about the eighth day of March, 1919, the said plaintiffs moved upon said land in Crook County, Oregon, took possession of the same and all said personal property and continued in possession thereof from about the eighth day of March, 1919, without complaint or objection of any kind until the commencement of this suit on or about the eleventh day of

June, 1919; that prior to the commencement of this suit and at the time and date thereof, plaintiffs at no time or place and in no way or manner offered to rescind said contract and never at any time offered or tendered back said property or any deed, bill of sale or other conveyance thereof; that since the institution of said suit plaintiffs have remained in possession and control of said property and since the institution of this suit, the particular day and date being to defendants unknown, without an order from the above-entitled court and without the knowledge or consent of the defendants, plaintiffs have sold and disposed of various articles of said personal property, the particular ones being to defendants unknown, except the said twenty head of cattle which plaintiffs sold for the sum of one thousand dollars; and that the plaintiffs kept and retained said sum of one thousand dollars and failed and neglected to tender the same unto the court upon the filing of their first amended complaint herein and never at any time offered and tendered said sum of money in lieu of said cattle to the defendants; that by reason thereof plaintiffs have ratified and affirmed said exchange and said exchange of said property being ratified by plaintiffs, plaintiffs are not entitled in law or equity to a rescission thereof.

"And for a second further and separate answer and defense to the second amended complaint of the plaintiffs, defendants allege:

"That the spring of 1919, namely, from about the 1st of March, 1919, to about the eleventh day of June, 1919, in Crook County, Oregon, and at the place where said Crook County property was situated was unusually and exceptionally dry and both the snowfall and rainfall were and had been unusually and exceptionally light; that by reason thereof the grass, hay, grain, vegetables and crops were a failure; that in addition thereto said section was visited by an early, exceptional and unusually heavy frost for all of which reasons for the year 1919 said section, said crops of grass, hay, grain and vegetables were practically and

completely a failure; that plaintiffs remained in possession of said property, satisfied therewith and without any objection thereto until plaintiffs ascertained by reason of said weather conditions that said crops would be a failure and that said conditions were not the fault in any way or manner of the defendants and that said conditions and not any representations of any kind of the defendants were and are the reasons of plaintiffs' admitted rescission of said contract herein.

"And that for a third and separate answer and by way of explanation to the allegations contained in said complaint, *plaintiffs* allege that the *plaintiffs* had upon said premises about 150 sacks of potatoes and a large quantity of rye straw; that defendants agreed in said exchange to give said potatoes and said straw to the plaintiffs; that defendants did not represent that said potatoes or said straw had been raised upon said land; that defendants did show plaintiff John Larsen the small tract of land planted in potatoes and showed the said plaintiff the tract of land upon which the defendants had raised rye, but at no time or place did defendants represent or state that said potatoes and said rye, and straw were raised upon said land."

The new matter in the answer was put at issue by appropriate denials.

The case came on for hearing before Hon. GEORGE TAZWELL, Circuit Judge, who found generally for the plaintiffs and rendered a decree requiring defendants to reconvey to them the real property received by themselves, to return to plaintiffs the personal property, and to pay into court the sum of $600, the reasonable rental of the real property received by them from plaintiffs. The decree required plaintiffs to reconvey to defendants the real property received by themselves in the exchange, to return the livestock, farm machinery, harness and tools which they re-

ceived from defendants, except that in lieu of one horse which they were unable to deliver they should pay to defendants the sum of $36, the adjudged reasonable value thereof. Plaintiffs were further required by the decree to pay to defendants the $1,000 received from the sale of cattle, with interest at 6 per cent from November 16, 1919, to pay into court for defendants the sum of $150 with interest at the same rate from August 1, 1919, in lieu of the hogs and chickens received by them in the trade, and to pay $115 to reimburse defendants for interest paid by the latter upon a mortgage which was on plaintiffs' property when the exchange was made, together with $10 paid by defendants for repairs on the house.

The defendants, being dissatisfied, appeal.

AFFIRMED.

For appellants there was a brief and oral argument by *Mr. Henry S. Westbrook.*

For respondents there was a brief over the names of *Mr. Wilbur Henderson* and *Messrs. Davis & Farrell,* with an oral argument by *Mr. Henderson.*

McBRIDE, J.—That defendants were guilty of several materially false representations in order to induce plaintiffs to make the exchange, in our judgment is clearly proved. The very initial step, namely, putting the advertisement in the newspaper, was calculated to defraud anyone who might be attracted by it. The material portion of the advertisement is as follows:

"Eastern Oregon ranch stocked and equipped; 75 acres in crop. Want modern home in city. Main 2558. Sletten & Jones, 248 Stark Street."

Sletten & Jones were real estate dealers acting on behalf of defendants. The advertisement was false in this, that there were not seventy-five acres or more than fifty acres in cultivation on the ranch. This was the representation that led plaintiffs to answer the advertisement. The testimony satisfies us that defendants represented that the land would produce good crops of hay and rye, when as a matter of fact they knew that it would not. We are also satisfied from the evidence that they represented to plaintiffs that in the year 1918 they had raised enough rye on the place to feed twenty-five head of cattle and five horses of their own, and also cattle belonging to others, whereas only a small portion of the hay so used was raised on the premises in question.

We are satisfied that defendants represented to plaintiffs that the land was suitable for raising potatoes and that they had raised a large quantity on the place, and that they actually exhibited to plaintiff John Larsen 150 sacks of potatoes then in the cellar on the place, and gave him to understand that the same had been raised there, when in fact they had been grown on another place five miles away. We are also satisfied that defendants knew that the soil on the land in question, and the frosts that prevailed there, rendered it impossible for plaintiffs to raise potatoes thereon.

We are satisfied that when defendants were asked about the school facilities for plaintiffs' two children, they represented that there was a schoolhouse within a mile and a half, where a nine months' school was maintained, whereas there was never a nine months' school maintained there, but one for a very few months only, and at any time, at irregular and

uncertain intervals; and that defendants knew this to be the fact.

In short, without going into detail, we are convinced that in these and other matters defendants willfully misled plaintiffs as to the character, qualities and productiveness of the land; that the representations were material and were intended to deceive plaintiffs and fraudulently to induce them to make the exchange; and that plaintiffs relied upon these representations in making the trade.

It remains only to discuss the question of whether or not plaintiffs' conduct in the matter has been such as to preclude them from receiving equitable relief. It may be proper here to say that while the wives of the male parties are technically parties to the suit, the principal actors in the trade were the respective husbands, the women for the most part being merely passive in the transaction.

3. It is contended that Mr. Larsen, having visited and inspected the place and having had before him the opportunity of knowing its capabilities and condition as to cultivation, cannot now be heard to say that he was misled by the representations of Lootens. The books teem with decisions respecting the effect of an independent investigation by the purchaser, upon the weight to be attached to false representations by the vendor. The earlier decisions held the purchaser to a very strict rule in such case, apparently upon the theory that in the long run it was better public policy to discourage negligence and carelessness than to punish fraud. Concerning this attitude of the early courts and the progress made to a more equitable rule, a recent work remarks:

"The policy of the courts is, on the one hand, to suppress fraud, and, on the other, not to encourage

negligence and inattention to one's own interests. The rule of law is one of policy. Is it better to encourage negligence in the foolish, or fraud in the deceitful? Either course has obvious dangers. But judicial experience exemplifies that the former is the less objectionable, and hampers less the administration of pure justice. The law is not designed to protect the vigilant, or tolerably vigilant, alone, although it rather favors them, but is intended as a protection to even the foolishly credulous, as against the machinations of the designedly wicked. The courts, however, are not entirely in accord as to the circumstances under which fraudulent representations may be relied on, although it cannot perhaps be denied that negligence as a defense in cases of fraud has been in danger of being pushed too far. There would seem to be no doubt that while, in the ordinary business transactions of life, men are expected to exercise reasonable prudence, and not to rely upon others, with whom they deal, to care for and protect their interests, this requirement is not to be carried so far that the law shall ignore or protect positive, intentional fraud successfully practiced upon the simple minded or unwary. Again, where the means of obtaining information are not equal, the positive representations of the person who is supposed to possess superior means of information may be relied on." 12 R. C. L., p. 360.

From a review of the authorities therein cited is deduced the following general rule:

"Where a party to whom representations are made is put upon inquiry by his knowledge of the facts and undertakes to make an investigation of his own, and the other party does nothing to prevent this investigation from being as full as the investigator chooses to make it, the investigator will not usually be heard to say that he had the right to rely on such representations. The mere fact of investigation, however, does not necessarily deprive one of the right to rely on representations; as, for example, where expert

knowledge is possessed by the party making the representation and not by the other. Nor does the fact that one makes an examination or makes inquiries necessarily show that he did not rely on the false representation of the other party." 12 R. C. L., p. 361.

Many cases support the rule stated in the above quotation: *Mitchell* v. *Zimmerman,* 4 Tex. 75 (51 Am. Dec. 717); *Circle* v. *Potter,* 83 Kan. 363 (111 Pac. 479); *Morrow* v. *Bonebrake,* 84 Kan. 724 (115 Pac. 585, 34 L. R. A. (N. S.) 1147); *Tooker* v. *Alston,* 159 Fed. 599 (16 L. R. A. (N. S.) 818, 86 C. C. A. 425).

With the law as laid down by the above authorities in mind, let us now consider the defense of independent investigation interposed here. Plaintiff's visit of inspection was made on March 29, 1918, not a very propitious month to examine critically and appraise the productive qualities of land anywhere in Oregon, and particularly in that part of Crook County where the land in controversy is situated, which is over four thousand feet above sea level and where, as the evidence shows, winter conditions prevailed at the time of Larsen's visit. Larsen says that the ground was covered with several inches of snow. The defendant admits that snowy conditions prevailed but claims that the snow had all been blown off the field he showed to Larsen. Where all the snow had blown, the Lord knoweth; but as one witness made the chance remark that during one season part of a crop on this or adjoining land had been blown out, we are prepared to believe that zephyrs sometimes prevail in that elevated region adequate to blow the snow off a tract of seventy-five acres of land. However, as we are not greatly impressed with Mr. Lootens' truthfulness in other matters, we are disposed to accept

Larsen's statement and conclude that there was at least some snow on the ground which rendered examination of the soil difficult. And even if he had made a more careful examination, he would probably have been unable to form an adequate idea of the productiveness of the soil. He had only his eyesight by which to judge of the soil quality. With him was Lootens, who had lived upon the place for years and knew that the soil was poor and unproductive, yet all the while falsely assuring him that it would raise excellent crops of rye, potatoes and other vegetables, and exhibiting hay and potatoes raised on other ranches, in proof of his false assertions. No doubt this prevented the plaintiff from making a more searching investigation than he did, during his three hours' stay at the Lootens ranch.

That Lootens did make these representations, is shown not only by the testimony of Larsen but by that of Gulodson, a neighbor who visited defendants shortly after they had moved into the Larsen home in Portland, and, seeing what Lootens had got in exchange for his arctic ranch, was curious to know how the trade was accomplished. We quote from Gulodson's testimony:

"I asked him how he did it, and I said, 'How did you do it?' because the dry years discourage lots of people, and my wife wanted to get out of there and wanted me to get out of it, and while I was not trying to make any trouble I asked him how he did it, and he said he took him out there and that he thought he was getting everything for nothing.

"Q. Did he say anything to you about what he said to Mr. Larsen about the potatoes and the hay?

"A. He said he showed him the hay and potatoes but didn't tell him he had raised it there.

"Q. Did he say he had raised the hay there?

"A. The straw—the straw he spoke of.

"Q. Did he say that he told him that he had raised the hay or the straw—what did he say about that?

"A. He said the man saw the straw stack and he asked him if he raised the grain here and he says, 'Why, we raise grain here.'

"Q. Did he say he showed him the potatoes and whether Mr. Larsen asked him if he raised the potatoes?

"A. He showed him the potatoes, and that was all and Mr. Larsen said nothing, only he said he never saw such fine potatoes in Oregon, and he told me plainly that he didn't tell Mr. Larsen that he had raised them; I don't remember his exact words about that; that is something I don't remember.

"Q. But Mr. Larsen understood the potatoes was raised on the place?

"A. Undoubtedly; any one seeing the potatoes there would think they were raised there, not thinking like salting a mine or anything like that."

The witness very properly designated the process by which Lootens induced plaintiffs to trade. The ranch was "salted," "salted" with potatoes and hay raised on other and more productive tracts.

Even conceding that no more was said by Lootens than he stated to Gulodson, the effect was the same, and Lootens intended that it should be the same as if he had stated outright that he had raised the hay and potatoes on the land he proposed to sell. A half truth is sometimes the worst kind of a lie. As observed by Mr. Justice BURNETT in *Palmiter* v. *Hackett*, 95 Or. 12 (185 Pac. 1105, 186 Pac. 581):

"When a defendant opens his mouth to make declarations respecting the property involved, he must speak the whole truth, and * * a suppression of part of the fact is fraud when made to induce a purchase. This does not infringe upon the rule that individuals dealing at arm's-length must look out for themselves and that mere silence is not fraud where no duty

is imposed upon one to speak. A half truth, however, spoken with a design of influencing the opposite party where he has not equal means of knowledge, is in itself fraudulent.''

There is little doubt that Lootens did tell Larsen he had raised potatoes on the place. Larsen and his wife testify positively to that and are corroborated to some extent by Sletten, who was defendants' agent in procuring a purchaser. Equity has slight tolerance for the party who says in effect to an injured party, ''Even if I did make false representations, you were so negligent in not ascertaining their falsity that you do not deserve relief.'' While it is true that ''Equity is for the diligent,'' it has some regard for the credulous, the ignorant and even the negligent, unless relief from the consequences of such negligence will work a greater inequity than would be occasioned by refusing such relief.

4, 5. Another objection is that plaintiffs remained in possession of the premises after they had discovered the falsity of the alleged representation; in other words, that by not acting promptly, repudiating the contract after their discovery of the fraud, they elected to affirm it. It seems probable that after the trade was made and the title passed, about May, 1918, plaintiffs discovered that a portion of the seventy-five acres in cultivation and represented by defendants to be upon the land in controversy was not in fact a part of the property exchanged, but was part of a neighbor's land; and that plaintiffs did not immediately make objection or demand rescission on this account, but continued in possession until two months later before making such objection or demanding a rescission. Granting, for the sake of argument, that plaintiffs are too late to ask rescission

on this ground, there still remain the representations in regard to the capacity of the land for hay and vegetables, the quality of the soil and the contiguity of a school, the falsity of which they discovered later and which in the nature of things it took time to develop and disclose. As to these, plaintiff John Larsen swears, and we believe him, that as soon as he discovered that the soil was worthless, that the potatoes, straw and rye had not been raised on the place but had been hauled in from other localities, he dropped everything and went to Portland and demanded a re-exchange of properties. Plaintiffs moved on the ranch probably early in May, and this demand must have been made sometime between that time and June 11, 1919, when this suit was commenced. Under all the circumstances, we are of the opinion that plaintiffs were sufficiently prompt in demanding a rescission. It is true, their demand and offer to return the property received were not technical or couched in the formal language that a lawyer would have used, but it was sufficient to convey to the defendants a knowledge of the fact that plaintiffs were ready to restore what they had received from defendants, on condition that the latter would restore what they had received from plaintiffs. It is also true that the making of this offer was denied by defendant Bert Lootens and his faithful friend and witness, Giger, who by a singular coincidence always happened to be on hand when anything occurred between the parties. But the Circuit Court did not believe their testimony, and neither do we. In a case involving contradictory testimony the opinion of the trial judge who saw the witnesses and had an opportunity to appraise the value of their testimony at first hand, is entitled to great weight.

6, 7. Not only do we hold the offer sufficient, but it is far from being an invariable rule in equity that a party must offer to return the property received by him, before bringing suit, if in his complaint he offers so to return it and submits himself in that respect to the equitable jurisdiction of the court. A leading case on the subject in this state is *Crossen* v. *Murphy,* 31 Or. 114 (49 Pac. 858), in which Mr. Chief Justice Moore observed:

"On a suit in equity for a decree of rescission, the complaint need not allege a tender or offer to perform: *Bloomer* v. *Waldron,* 3 Hill, 366; *Hoyt* v. *Jaques,* 129 Mass. 286. The maxim that 'he who seeks equity must do equity' is evidently not violated by the failure of the plaintiff in a suit to rescind a contract for fraud to allege a restoration of, or an offer to return, the consideration, or a willingness even to do so; for by his application to the court for equitable redress he concedes that before it will be awarded he must do equity, which will compel him to account for everything of value he may have received, thereby tacitly inviting the court to protect the rights of the defendant by decreeing a restoration in consideration of the rescission. This method would permit a vendor who had been defrauded, but who was unable to restore the consideration, to institute a suit to rescind a contract voidable for fraud; for the court could do equity by all parties by decreeing that the amount so received should be a lien upon the property in favor of the vendee."

This in nowise conflicts with the doctrine announced in *Scott* v. *Walton,* 32 Or. 460 (52 Pac. 180); *Vaughan* v. *Smith,* 34 Or. 54 (55 Pac. 99); and *Seeck* v. *Jakel,* 71 Or. 35 (141 Pac. 211, L. R. A. 1915A, 679).

In *Scott* v. *Walton* the plaintiff with full knowledge of the alleged misrepresentations waited a full year before offering to rescind, and brought his suit for

rescission the day after the offer was made. The court there held that he had not acted with sufficient promptness after the discovery of the alleged misrepresentations. The question as to whether an offer to rescind should be made before suit, was not raised. The court did say that the fact that the plaintiff had remained in possession of the property and dealt with it as his own was *evidence* of an intention to abide by the contract. In that case, or in any, it certainly was evidence, and strong evidence, of such intention.

*Vaughan* v. *Smith, supra,* was a suit to rescind a purchase of real property and to recover the purchase money paid thereon, on the ground that the seller had made false representations that there were no encumbrances on the land, whereas there was in truth and in fact an easement or right of way across the property which detracted from its value. The court below, the writer of this opinion being the trial judge, found that plaintiff with full knowledge of the existence of the encumbrance had entered into and continuously retained possession of the land and received the rents and profits thereof, amounting to $675, and had never offered to pay for the use and occupation of the land, disaffirmed the contract, offered to reconvey the land to defendants, or made any demand on them for the money he had already paid, but had in all respects acted as the owner of the land. Upon this state of facts the Circuit Court entered a decree dismissing plaintiff's suit, which decree was affirmed on appeal. The opinion in that case was written by Mr. Justice MOORE, who also wrote the opinion in *Crossen* v. *Murphy, supra;* and, far from attempting to overrule the doctrine enunciated in that case, he cited it as an authority in the case he was then considering. Among other things, he said:

"The law is well settled in this state that a party desiring to rescind a contract must act promptly upon the discovery of the accident, fraud, or mistake, which affords a ground for the relief sought, and place the other party *in statu quo;* returning or offering to return that which has been received: *Knott* v. *Stephens,* 5 Or. 235; *Frink* v. *Thomas,* 20 Or. 265 (25 Pac. 717, 12 L. R. A. 239); *Clarno* v. *Grayson,* 30 Or. 111 (46 Pac. 426); *Crossen* v. *Murphy,* 31 Or. 114 (49 Pac. 858).

"In *Scott* v. *Walton,* 32 Or. 460 (52 Pac. 180), Mr. Justice BEAN, in speaking of the right and duty of a party who seeks to rescind a contract, says: 'A party who has been induced to enter into a contract by fraud has, upon its discovery, an election of remedies. He may either affirm the contract, and sue for damages, or disaffirm it, and be reinstated in the position in which he was before it was consummated. These remedies, however, are not concurrent, but wholly inconsistent. The adoption of one is the exclusion of the other. If he desires to rescind, he must act promptly, and return or offer to return what he has received under the contract. He cannot retain the fruits of the contract, awaiting future developments to determine whether it will be more profitable for him to affirm or disaffirm it. Any delay on his part, and especially his remaining in possession of the property received by him under the contract, and dealing with it as his own, will be evidence of his intention to abide by the contract.' In the case at bar the evidence supports the finding of the court that plaintiff remained in possession of the land after he had discovered the existence of the right of way across the premises, and treated the property as his own, thereby manifesting an intention to ratify the contract, which precludes its rescission."

*Seeck* v. *Jakel, supra,* is not in point here. In that case the defendants had purchased a feed barn in the town of Lebanon, the deed containing a condition

that the conveyed premises should not be used for the carrying on of a livery business, and that if used for that purpose the property should revert to the grantors. The defendants suffered the premises to be so used, and the plaintiffs brought an action at law to recover possession. The defendants answered and among other things alleged that the forfeiture clause in the deed was procured by fraud. This court found that in any event the transaction between the parties was entire and if repudiated or rescinded should be canceled as a whole; and that the defendants with full knowledge of the facts had continued in possession of the property for more than four years without offering to rescind or offering either before the suit or in their answer to return the property. Among many other authorities the opinion cited *Crossen* v. *Murphy, supra.*

Not only has the doctrine enunciated in *Crossen* v. *Murphy* been tacitly approved in the cases above cited, but it has been expressly approved and reiterated in the following cases: *Owen* v. *Jones,* 68 Or. 311 (136 Pac. 332); *Merrifield* v. *McClay,* 72 Or. 90 (142 Pac. 587); *Palmiter* v. *Hackett,* 95 Or. 12 (185 Pac. 1105, 186 Pac. 581). The last case, finally decided here in 1920, is the most recent authoritative utterance of this court and may be considered as finally settling this contention.

In the case at bar, plaintiffs not only offered to return the property before suit, but tendered a return after suit, except of such livestock as they alleged they had sold after suit to prevent the same from starving and for which they offered to pay the money received and any further sum which the court might adjudge equitable. Whatever may be said of the legality of the sale made by plaintiffs after suit

was begun, it was made with notice to defendants and tended to minimize their damages. It was much better for all the parties, and more humane, than to leave the stock to suffer and starve during the winter. The court liberally provided for defendants in this regard, by making its decree in favor of plaintiffs contingent on their paying over the money received from the sale of cattle, hogs and chickens, and adding thereto 6 per cent interest from the date of sale. The decree puts defendants *in statu quo* financially, which is all that equity requires.

8. It is claimed for the defendants that the complaint is insufficient because it does not allege in terms that plaintiffs have been damaged in the exchange. No doubt this would be true in an action for deceit; but such is not the case where a rescission is sought. The plaintiffs were seeking a place where they could raise stock and incidentally thereto hay, grain, potatoes and other vegetables, and situated in a locality where a regular school was maintained. A tract which would not produce fair crops of hay and grain would be rather a sorry stock ranch; land that would not at least produce potatoes would be a poor place for a home; and a country where the population is so scant as to furnish few and irregular school facilities would not be a desirable locality in which to rear a family. Defendants promised plaintiffs all these, but failed to "deliver the goods" and should not be heard to say that they have delivered something just as valuable: *McGowan* v. *Willamette Valley Land Co.*, 79 Or. 454 (155 Pac. 705).

On the whole, we are of the opinion that the plaintiffs have made out a clear case, and that there is nothing in their conduct that should preclude them

from equitable relief. The decree is eminently fair to the defendants and should be affirmed.

AFFIRMED.

BURNETT, C. J., and HARRIS and RAND, JJ., concur.